Filed:  June 5, 1996

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

—————————

No. 94-5526
(CR-89-466-JFM)

—————————

United States of America,

Plaintiff - Appellee,

versus

Tom J. Billman,

Defendant - Appellant.

—————————

O R D E R

—————————

The Court amends its opinion filed May 21, 1996, as follows:

On page 4, first paragraph, line 3 -- the words "do support" are corrected to read "<u>does</u> support."

For the Court - By Direction

/s/ Bert M. Montague

————————————————

Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 94-5526

TOM J. BILLMAN,
Defendant-Appellant.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Chief District Judge.
(CR-89-466-JFM)

Argued: February 2, 1996

Decided: May 21, 1996

Before LUTTIG, Circuit Judge, BUTZNER, Senior Circuit Judge,
and DOUMAR, United States District Judge for the Eastern District
of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** John Robert Fornaciari, ROSS & HARDIES, Washington,
D.C., for Appellant. Barbara Slaymaker Sale, Assistant United States
Attorney, Joyce Kallam McDonald, Assistant United States Attorney,
Baltimore, Maryland, for Appellee. **ON BRIEF:** Robert M. Disch,
ROSS & HARDIES, Washington, D.C., for Appellant. Lynne A. Bat-
taglia, United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellant Tom Billman was one of four people indicted in 1989 for conspiracy (18 U.S.C. § 371), racketeering (18 U.S.C. § 1962(c)), and eighteen counts of wire and mail fraud (18 U.S.C. §§ 1341 & 1343), following the collapse of the Maryland-chartered Community Savings and Loan approximately six months after Billman sold his interests in the various partnerships connected with Community for nearly $30 million. Billman's co-conspirators were acquitted after a four-month trial in 1992. Billman, however, had fled the country in 1988 after the Maryland Deposit Insurance Fund won a civil judgment of $112 million against him. He was subsequently arrested in France in March 1993, extradited in December 1993, and, after a bench trial on all but the conspiracy and racketeering counts, found guilty of eleven counts of wire and mail fraud, and sentenced to forty years in prison and ordered to pay nearly $42 million in restitution to the Maryland Deposit Insurance Fund. Billman's principal argument is that the prosecution of the wire and mail fraud counts was contrary to the terms of the French extradition decree, and therefore barred.

The United States requested extradition of Billman under the Franco-American extradition treaty of 1909. Article VII of the Treaty incorporates the "doctrine of specialty," which prohibits the requesting nation from prosecuting the extradited individual for offenses other than those on which the surrendering nation agreed to extradite.[1] See United States v. Rauscher, 119 U.S. 407, 418-19 (1886); United States v. Khan, 993 F.2d 1368, 1373 (9th Cir. 1993). Compare United

_____

[1] "No person surrendered by either of the High contracting Parties to the other shall be triable or tried or be punished for any crime or offence committed prior to his extradition, other than the offence for which he was delivered up . . . ." Extradition Convention, Jan. 6, 1909, U.S.-Fr., art. VII, 37 Stat. 1526, 1531 ("Treaty").

2

States v. Alvarez-Machain, 504 U.S. 655, 659-60 (1992) (distinguishing Rauscher on the ground that the defendant was not before the court by virtue of a treaty). Article I of the Treaty allows for extradition "only . . . upon such evidence of criminality as, according to the laws of the [surrendering nation], would justify his or her apprehension and commitment for trial if the crime or offence had been there committed." 37 Stat. at 1527. Article II of the Treaty, as amended, provides a list of crimes for which extradition "shall be granted . . . if they are punished as crimes or offenses by the laws of both States." Supplementary Convention, Feb. 12, 1970, U.S.-Fr., art. II, 22 U.S.T. 408, 409 ("Treaty Supp."). Although mail fraud and wire fraud were not covered by Article II of the original Treaty, they are covered by the 1970 supplement to the Treaty, see id., art. II, ¶ 18,[2] and thus extradition for those counts "shall be granted" under the explicit terms of the Treaty if the crimes are also punished as crimes or offenses by France.[3]

French law apparently provides that requests for extradition are initially considered by the Paris Court of Appeals, which issues a recommendation known as "Enacting Terms." The "Enacting Terms" are then forwarded to the Prime Minister, who makes the decision upon which, if any, of the offenses to grant extradition. Appellant's Br. at 9 (citing Law of March 10, 1927, Arts. 13-17). The Prime Minister then issues a Decree of extradition, at which point the proceedings of the Paris Court are "absorbed" into the decree and "deprived of any autonomous existence." A party may take an appeal from the Decree itself, but no appeal was taken in this case.

The Paris Court found that all four crimes with which Billman was charged -- conspiracy, racketeering, mail fraud, and wire fraud -- were "unknown in French penal law." J.A. at 143-44. Thus, in its view, Article II of the amended Treaty did not provide authority for extradition as to those particular crimes. But the Paris Court also

_____

[2] Adding "Use of the mails or other means of communication in connection with schemes devised or intended to deceive or defraud the public or for the purpose of obtaining money or property by false pretenses" to the list of crimes covered by Article II. 22 U.S.T. at 409.

[3] RICO and conspiracy are concededly not covered, and Billman was not prosecuted for those counts of the indictment.

3

reviewed the evidence supporting the wire fraud counts, and found that although "French law does not punish these actions as such," the conduct giving rise to the charges does support the French crime of "abus de confiance," or "breach of trust." J.A. at 144-45; 170-71. Similarly, the Paris Court found that the evidence supporting the mail fraud counts constituted the French crime of "escroquerie," or "fraud." J.A. at 146; 172. Extradition for the latter two categories of crimes was thus permitted, according to the Paris Court, under Article II of the Treaty, paragraph 7 ("breach of trust" or"abus de confiance et detournements") and paragraph 8 ("obtaining money or other property by false pretenses" or "escroquerie"). See Supp. Treaty, art. II, ¶¶ 7, 8, 22 U.S.T. at 409, 413. The Paris Court therefore issued an order recommending in favor of extradition, "but only with respect to the infractions termed breach of trust and fraud, and hence to the exclusion of the infractions termed conspiracy, criminal organization, mail fraud and wire fraud, in connection with which the Criminal Court believes it would be inappropriate to approve the request." J.A. at 150. The Prime Minister adopted the recommendation of the Paris Court and, through an Extradition Decree, granted extradition "only for the offenses called swindle [fraud] and fraudulent misuse of funds [breach of trust]." J.A. at 176.**4**

Both the opinion of the Paris Court and the Extradition Decree were thus self-contradictory: extradition was not granted for the mail and wire fraud counts, but it was granted for those same counts because the conduct giving rise to those counts was also criminal under French law. Billman filed a motion in federal district court seeking release from custody in France, in which he argued that since the Decree only authorized prosecution for "swindling" and "fraudulent misuse of funds," he could not be held because those were not crimes listed in the United States code nor charged in the indictment.**5**

_____

**4** The different language is a result of a different English translation, not an alteration from the recommendation of the Paris Court. Both the Paris Court and the Extradition Decree granted extradition for the crimes of "escroquerie" and "abus de confiance," J.A. at 174, 178, which, for consistency, we translate as "fraud" and "breach of trust."

**5** The Government argues that the"doctrine of specialty" confers a right to enforce the terms of the extradition decree only upon the extraditing

While that motion was pending, the United States Government sought clarification of the Paris Court's order and of the Extradition Decree by filing, through the Attorney General of France, a "request for interpretation" with the Paris Court. Appellee's Br. at 8; J.A. at 260. The Paris Court issued a decision in which it clarified its earlier opinion and, by implication, the identical language of the Extradition Decree based upon that opinion, stating that the Conspiracy and Racketeering counts were not extraditable offenses, but that the mail and wire fraud counts were, because, although they "do not exist as such under French law, [Billman's actions] nonetheless . . . constitute the offenses of breach of trust and fraud provided for and repressed under the French Code." J.A. at 271. Based on the clarifying opinion of the Paris Court, the district court denied Billman's motion for release. Billman's attempts to avoid the clear import of the decision by the Paris Court are unavailing.

First, Billman asserts that the Extradition Decree unambiguously denied extradition for the mail and wire fraud counts, and that, pursuant to Article VI of the Treaty, that denial is unreviewable in American courts. While Billman is correct in asserting that the decision of

_____

nation, not the individual extradited. While we need not address this argument because we find Billman's challenge without merit in any event, we note that, at the very least where, as here, the Treaty itself vests the defendant with a right to raise the doctrine of specialty, then the challenge must be permitted. See United States ex rel. Donnelly v. Mulligan, 74 F.2d 220 (2nd Cir. 1934); see also Fiocconi v. Attorney General of United States, 462 F.2d 475, 478 n.4 (2nd Cir.) (referring to the French treaty as conferring such a right), cert. denied, 409 U.S. 1059 (1972); Khan, 993 F.2d at 1373-75 (implicitly interpreting similar provision in the extradition treaty between the United States and Pakistan as conferring such a right); cf. Rauscher, 119 U.S. at 422 (stating that a court cannot decline to give force to a "specialty" provision in an extradition treaty which does not explicitly confer a right in the defendant himself, "without an implication of fraud upon the rights of the party extradited, and of bad faith to the country which permitted his extradition" (emphasis added)); Fiocconi, 462 F.2d at 478 (recognizing that the Court in Rauscher rejected the argument that an extradition treaty "confers no rights [to raise a violation of the doctrine of specialty] on persons who have been . . . extradited unless this has been spelled out").

5

the French government is unreviewable in the courts of the United States, see Johnson v. Browne, 205 U.S. 309 (1907) (holding, with regard to a similar provision in another treaty, that "[w]hether the crime came within the provision of the treaty was a matter for the decision of the [surrendering] authorities, and such decision was final by the express terms of the treaty itself"), he is incorrect in asserting that the Extradition Decree is unambiguous.[6] In fact, as described above, it is self-contradictory, and neither Article VI of the Treaty nor Browne require the United States courts to accept Billman's interpretation of the ambiguous extradition decree.

Second, Billman claims that only the Extradition Decree, not the opinions of the Paris Court, is binding under French law and under the terms of the Treaty. While French law apparently does provide that the "Enacting Terms" of the Paris Court are absorbed into the Extradition Decree and deprived of any autonomous existence, that proposition does not address the question whether the subsequent opinion by the Paris Court, essentially interpreting the ambiguous Extradition Decree,[7] is similarly without force absent a subsequent

---

[6] Billman's argument that the Decree is unambiguous is based on his erroneous claim that the United States sought extradition for the crimes of "escroquerie" and "abus de confiance" in its original extradition request in addition to the four crimes actually charged in the indictment, and that that part of the request, and only that part, was granted. Reply Br. at 4. The part of the extradition request to which Billman refers explicitly addresses the racketeering count of the indictment, both by name and code section, see J.A. at 129; the translation of that request replaced "racketeering" with "escroquerie et abus de confiance," J.A. at 133, because there is no French word for racketeering. Both the Paris Court and the Extradition Decree clearly rejected the request for extradition on the Racketeering Count, but used the same phrases "escroquerie" and "abus de confiance" to describe the actions underlying the wire and mail fraud counts. If we were to accept Billman's disingenuous characterization, which has its origin solely in the confusion generated by the imprecise translations, then we should, presumably, disallow the mail and wire fraud prosecutions but allow Billman to be prosecuted for racketeering, translated as "Escroquerie et abus de confiance" in the original extradition request -- the very terms used in the Extradition Decree to describe the crimes for which extradition was being granted.

[7] The Paris Court appears to have "clarified" only the "Enacting Terms," not the Extradition Decree itself, see J.A. at 266-72, but the Extradition Decree was phrased in identical terms, see supra, note 4.

6

amendment to the Extradition Decree itself. The Treaty provides that, for extraditions from France, the interpretation of the French government is final. See Treaty, art. VI, 37 Stat. at 1530 ("If any question shall arise as to whether a case comes within the provisions of this article, the decision of the authorities of the Government on which the demand for surrender is made shall be final."). Billman emphasizes the word "government," Appellant's Br. at 11, in a misguided attempt to argue that the decision of the Prime Minister, as against the Paris Court, is what is binding, essentially misreading Article VI of the Treaty as a kind of separation of powers clause, when the clause clearly addresses which of the two governments -- the United States or France -- shall be the final interpreter of an extradition decision.**8**

The United States submitted its request for clarification of the contradictory Extradition Decree to the French Ministry of Justice (i.e., the relevant department of the executive branch of the French government), which forwarded it to the Paris Court. Billman was represented by his attorney at the hearing before the Paris Court. The clarification issued by the Paris Court can therefore properly be deemed the "decision" of the French government which would be unreviewable under Billman's characterization of Article VI of the Treaty. That decision clearly permits prosecution on the mail and wire fraud counts, and the district court therefore properly denied Billman's motion for release from custody.

We have also reviewed Billman's several claims regarding the scope of the indictment, evidentiary issues, and the sufficiency of the

_____

**8** Moreover, although the United States does not make the argument, the language from Article VI on which Billman relies appears to apply only to offenses that come "within the provisions" of Article VI itself, namely, "offence[s] of a political character." 37 Stat. at 1530; see also Supp. Treaty, art. VI, ¶ 4, 22 U.S.T. at 410 ("Extradition shall not be granted . . . If the offense for which the individual's extradition is requested is of a political character, or if he proves that the requisition for his surrender has, in fact, been made with a view to try or punish him for an offense of a political character. If any question arises as to whether a case comes within the provisions of this subparagraph, the authorities of the Government on which the requisition is made shall decide.").

7

evidence, and find them to be equally without merit. Accordingly, we affirm the judgment of the district court.

AFFIRMED.

8